James T. BAKER, et al., Appellants,

v.

Robert F. SURMAN, et al., News Realty, Inc., et al., United Homes Corp., et al., Respondents,

E.J. Henry, etc., Defendants,

Leroy E. Haeg, Respondent.

No. C1–84–1022.

Court of Appeals of Minnesota.

Jan. 22, 1985.

**110**

Richard J. Sheehan, Minneapolis, for appellants.

Robert F. Surman, pro se.

Ralph A. Gale, Jr., Minneapolis, for News Realty, Inc., et al.

Lawrence P. Marofsky, Minneapolis, for United Homes Corp., et al.

Lyle F. Frevert, Minneapolis, for Haeg.

Considered and decided by SEDGWICK, P.J., and FOLEY and CRIPPEN, JJ., with oral argument waived.

## OPINION

FOLEY, Judge.

James and Monica Baker purchased a home from Robert and Judith Surman which later proved to have a leaky roof and basement. They sued Surmans for breach of warranty, the realty companies and realtors involved for misrepresentation, and a Federal Housing Administration (FHA) ap-

praiser for negligence. The trial court directed verdicts against Bakers in favor of the realty companies, the realtors and the appraiser. It awarded them a judgment of $5,000 against Surmans. Bakers appeal the directed verdicts and the amount of the judgment against Surmans. We affirm in part, reverse and remand in part.

## FACTS

In August 1975, the Bakers contacted John Bevis of United Homes Corporation to help them find a home. In September 1975 Bevis showed the Bakers the Surman home. While touring the home, Bakers observed a puddle in the corner of the basement and stains on the ceiling of a closet. They asked Bevis about both. He told them he would have to check with News Realty, the listing realty company.

Later Bevis contacted Al Pulfus of News Realty, who contacted Surmans about Bakers' two concerns. Pulfus relayed Surmans' answers to Bevis. Bevis told Bakers that Pulfus said Surmans had never had any problems with the roof, and that the puddle resulted from water coming in an open basement window.

Bakers and Surmans negotiated a purchase price for the home of $32,900, contingent upon FHA financing. Leroy Haeg, an FHA appraiser, valued the home at $31,250. After the appraisal, Bakers reduced their offer to the appraised value. The parties settled on a purchase price of $32,000.

When Bakers took possession in December 1975 the home was extremely dirty. They found broken doors, windows and screens. There was a large hole in a bedroom carpet and holes in the walls. The furnace, which Surmans had assured them was in good condition, was inoperable.

The day Bakers took possession they observed that the basement walls were bowed. Neither they, nor Bevis, nor Haeg previously noticed the bow because boxes and shelves obscured the walls. Pulfus noticed the bowed walls, but did not bring them to Bakers' attention.

In January or February 1976, water stains began appearing on the bedroom

ceilings. The leakage became progressively worse. Later that spring cracks appeared in the walls and floor of the basement. When it rained, water ran down the basement walls and seeped up through the cracks in the floor.

Bakers brought suit in 1980 and the case was tried in 1982. At trial, a roofing contractor who inspected the property in 1976 testified that, in his opinion, the roof had leaked for three to five years before Bakers bought the property. A masonry contractor who examined the house in 1982 concluded that the walls had been bowing for 10 to 15 years. An FHA review appraiser testified that FHA financing should not have been approved because of the bowing of the basement walls. He concluded that Haeg was negligent in not detecting the bow. Finally, an appraiser hired by the Bakers testified that the fair market value of the property in 1975 was $16,000. James Baker estimated that the home was worth only $5,000 when he bought it.

### ISSUES

1. Did the trial court err in finding as a matter of law that the FHA appraiser had no duty of care to potential home buyers?

2. Did the trial court err in finding as a matter of law that the realtors were not liable for fraud for relaying to potential buyers misrepresentations made by the sellers?

3. Is the trial court's damage award supported by the evidence?

### ANALYSIS

■ Bakers challenge the trial court's directed verdicts for the FHA appraiser, the realty companies and realtors. A trial court should grant a directed verdict only when it would clearly be its duty to set aside a contrary verdict as manifestly against the evidence or when such a verdict would not comply with the applicable law. The same standard governs appellate review of directed verdicts. *Midland National Bank v. Perranoski*, 299 N.W.2d 404, 409 (Minn.1980).

### I.

■ The trial court properly directed a verdict for Haeg because, as a matter of law, an FHA appraiser has a duty of care only to the federal government. A party who negligently supplies false information for the guidance of others may be liable to third parties if they are foreseeable recipients of the information and justifiably rely upon it to their detriment. *See Bonhiver v. Graff*, 311 Minn. 111, 121–22, 248 N.W.2d 291, 298–99 (1976).

■ A potential home buyer is a foreseeable recipient of an appraisal. However, the buyer cannot rely upon an FHA appraisal as a warranty of the value or condition of the home. The primary and predominant objective of the FHA appraisal system is the protection of the government and its insurance funds. The mortgage insurance funds do not insure anything other than the repayment of loans made by lender mortgages. The legislative history of the program makes it clear that Congress did not intend to establish a duty of care for the benefit of mortgagors. *United States v. Neustadt*, 366 U.S. 696, 706, 81 S.Ct. 1294, 1300, 6 L.Ed.2d 614 (1961); *Cason v. United States*, 381 F.Supp. 1362, 1367 (W.D.Mo.1974); *Summers v. United States*, 510 F.2d 123, 125 (8th Cir.1975). In the absence of such a duty, home buyers cannot recover damages for negligent appraisal from the federal government or an appraiser employed by the government. *See Gay v. Broder*, 109 Cal.App.3d 66, 167 Cal.Rptr. 123 (1980) (Veterans Administration appraiser not liable to home buyer for negligent appraisal of home).

### II.

■ The trial court directed a verdict for the realtors on the misrepresentation claims because the realtors were merely relaying information from the seller. However, a realtor may be independently liable for fraud if he or she knew or should have known of the misrepresentations of the principal. *Anders v. Dakota Land and Development Co.*, 289 N.W.2d 161, 163 (Minn.1980).

The trial court properly granted a directed verdict in favor of Bevis and United Homes. Bevis visited the Surman home only once. He did not know the basement or roof leaked and had no reason to doubt what Pulfus told him. He clearly informed Bakers of his ignorance and identified the source of his information.

There was also no evidence that Pulfus of News Realty knew the Surmans misrepresented the condition of their home. However, Pulfus, an experienced realtor, was the listing agent. He visited the home repeatedly and was aware that the basement walls were bowed. In such circumstances, reasonable persons could differ on whether he should have known that the assurances of water tightness were false. Therefore, Bakers' misrepresentation claim against Pulfus and News Realty should have been submitted to the jury.

Bakers contend that the jury also should have been permitted to consider whether Pulfus' failure to disclose the bowed basement wall constituted fraud pursuant to 4 M.C.A.R. 1.41508, subd. 17. Subd. 17 provided that a real estate broker's license could be denied, suspended or revoked for fraudulent, deceptive or dishonest practices, including "failing to disclose to a purchaser all material facts pertaining to the property, of which the agent is aware, which would adversely and significantly affect the purchaser's use or enjoyment of the property." However, that provision is inapplicable here because it did not become effective until 1978.

### III.

Finally, Bakers contend that the trial court's $5,000 damage award against Surmans is inadequate and unsupported by the evidence. The appropriate measure of damages in a breach of warranty case is the cost of curing the defect, or if that cost would be excessive, the dimunition in value caused by the breach. *Parkside Mobile Estates v. Lee,* 270 N.W.2d 758, 762 n. 5 (Minn.1978).

Evidence concerning the cost to cure was limited to testimony by James Baker and the roofer. Baker testified that he spent $1,689 on cleaning, repairs, and replacement of the bedroom carpet. The roofing contractor estimated that it would cost $1,100 to replace the roof at the time of trial. The masonry contractor testified that the only way to correct the problem with the basement would be to remove and replace the foundation. But, he did not specify the cost for such work. The only evidence concerning dimunition in value was James Baker's and his appraiser's testimony as to the fair market value of the property in 1975. Since the trial court's award does not comport with the evidence under either standard, Bakers are entitled to a new trial on the issue of damages. *See Parkside* 270 N.W.2d at 762–763.

### DECISION

We affirm the trial court's directed verdicts for FHA appraiser Haeg, realtor Bevis, and United Homes. We reverse the directed verdicts against realtor Pulfus and News Realty, and remand for retrial Bakers' misrepresentation claims against them. We also reverse the trial court's damage award against Surmans and remand for retrial the question of damages caused by Surmans' breach of warranty.